IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF GEORGIA

AUGUSTA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CR 119-125 |
| | ) | |
| MICHAEL VENETEZ MCRAE | ) | |

_____

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**
_____

Defendant seeks suppression of all statements and evidence obtained during his arrest on January 5, 2019. After careful consideration of all arguments and evidence, the Court **REPORTS** and **RECOMMENDS** Defendant's supplemental motion to suppress be **GRANTED IN PART** and **DENIED IN PART**, (doc. no. 29), and Defendant's original, superseded motion to suppress be **DENIED AS MOOT**, (doc. no. 20).

## I.    FACTS

At a suppression hearing on December 12, 2019, Richmond County Sheriff's Deputies Charles Durand and Ty Dailey testified on behalf of the government and Labrisha Keller, Defendant's ex-girlfriend, testified on his behalf. (Doc. nos. 35-36.) On January 5, 2019, Deputy Durand responded to a domestic call at the home of Ms. Keller. (Suppression Hr'g Tr., doc. no. 37, p. 11.) Deputy Durand turned on his body camera, met Ms. Keller in the driveway, and walked inside the home with her. (Durand Body Camera, doc. no. 25-1, disc 3, 00:00-00:10; Suppression Hr'g Tr., p. 11.) Deputy Durand asked Defendant his name but instead of identifying himself, Defendant complained to Ms. Keller about her calling the police, and she replied by ordering him to get out of the house. (Durand Body Camera,

00:00-01:00.)  While they were talking, Defendant and Ms. Keller walked down the hallway to Ms. Keller's bedroom with Deputy Durand following them.  (Id.)

Defendant attempted to close the bathroom door, but Deputy Durand would not let him.  (Id. at 00:45-01:30.)  Defendant stated he knew he was going to jail because he had outstanding arrest warrants for probation violations.  (Id.)  Deputy Durand testified he knew at this early point in the encounter he was going to detain Defendant because of the outstanding warrants.  (Suppression Hr'g Tr., p. 15.)  Defendant asked for his phone to inform his family he was going to be arrested.  (Durand Body Camera, 01:25-01:30.)  Ms. Keller told Deputy Durand she was in a hurry for everyone to leave the house because her kids were already in the car and they were headed out of town for a funeral.  (Id. at 01:30-01:45.)  Defendant moved out of the bathroom, located his phone, and walked outside with Deputy Durand.  (Id. at 01:45-01:55.)

Deputy Dailey arrived and turned on his body camera.  (Id. at 01:55-02:05; see also Dailey Body Camera 1, doc. no. 25-1, video 2 of disc 1, 00:00-01:00.)  Defendant became highly emotional while talking to his brother on the phone, falling down and repeatedly slamming his fist on the ground in the backyard.  (Durand Body Camera, 02:05-02:52.)  While on the ground, Defendant stated he did not do anything, to which Deputy Dailey responded, "If you didn't do anything why are you doing this?"  (Id. at 02:55-03:05.)   In a calmer demeanor, Defendant asked his brother to retrieve his bank card from Ms. Keller's house.  (Id. at 03:15-03:30.)  Deputies Durand and Dailey stood behind Defendant with handcuffs, ready to arrest him.  (Id.)

After the call, Deputy Dailey suggested they walk to his police car and determine whether Defendant had outstanding arrest warrants.  (Id. at 04:45-04:55.)   In response, without any questions or prompting, Defendant stated, "I use cocaine, I do have cocaine, and I have multiple cocaine charges."  (Id. at 04:52-05:00.)   The following exchange occurred after this admission:

| | |
|---|---|
| Durand and Dailey: | "Do you have cocaine on you?" |
| Defendant: | "Yes, ya'll can throw it away please. Don't let me get another felony.  I got fifteen years probation. That what I got the warrant for.  They took me to a homeless shelter." |
| Deputy Durand: | "Why are you doing cocaine, man? Where's it at?" |
| Defendant: | "I just smoked [*mumbling*] weed. I don't have no pound of weed."   *Begins handing over cocaine and magazine in his pockets.* "I got a clip on me. My lawyer will be able to tell you [*mumbling*] I sell weed.  I don't want no charges.  I'm just trying to be honest with you guys.  I got fifteen years probation. Like, I come from a background of parent . . . ." |
| Deputy Durand: | "Where's the gun at?" |
| Defendant: | "Uh, the gun like it's in the woods somewhere, I don't know exactly where." |
| Deputy Durand: | "What do you mean the woods? Is it stolen?" |
| Defendant: | "No." |
| Deputy Durand: | "Then, why is it in the woods?" |
| Defendant: | "Somebody told me to hold it for 'em and I've been having it for a couple days. I didn't want to keep a gun in the house with the kids." |
| Deputy Durand: | *Begins to arrest Defendant* |
| Defendant: | "I'm being straight up with you." |

| Deputy Durand: | "I know. Just turn around." |
|---|---|
| Defendant: | *Mumbling while being arrested.* |
| Deputy Durand: | "I got you but.  Who told you to hold the gun?" |
| Defendant: | "Some guy that I know. I ain't trying to get nobody in trouble man." |
| Deputy Durand: | "Well, if its stolen." |
| Defendant: | *Inaudibly speaking.* |
| Deputy Dailey: | "So, there is just a gun in the woods for some kid to find and shoot himself or shoot somebody else?" |
| Defendant: | *Inaudible over sound of wind.* |
| Deputy Durand: | "Yeah, but the gun could still be stolen?" |
| Defendant: | "Would you light the cigarette for me?" |
| Deputy Durand: | "Are you gonna show us where the gun is?" |
| Defendant: | "Honestly, if I knew where it was, just like I just gave you *[inaudible]*, I would give you that with no problem, cause that was a felony charge, sir. I'm willing to take that chance because of the circumstances and whatever, and honestly, just like anybody I wish I would have got away a couple more days or a little bit longer, so it wouldn't be like this.  It is what it is.  I have to man up and take it." |
| Deputy Durand: | "So, when did you hide the gun?" |
| Defendant: | "Like I said, I didn't hide . . ." |
| Deputy Dailey: | *Searching Defendant's pockets* "You got anything else on you?" |
| Defendant: | "My friend went and hid the gun." *Deputy Dailey leaves to go inside house.* |

4

| | |
|---|---|
| Deputy Durand: | "Your friend hid the gun?" |
| Defendant: | "We're not friends but" |
| Deputy Durand: | "What kind of gun was it?" |
| Defendant: | "I honestly, it's a black gun." |
| Deputy Durand: | "You don't know if it's a nine, a forty, or a forty-five, three eight?" |
| Defendant: | "I don't know much about guns. I never really" |
| Deputy Durand: | "Ok, is it semi-automatic? Obviously it was. I had a clip. Alright man. Let's go to the car and let me get your information real quick. So you had cocaine, what was the other stuff?  Crack?" |
| | *Deputy Durand begins escorting Defendant to police car.* |
| Defendant: | "I mix them together and put it in the weed." |
| Deputy Durand: | "You mix it and put it in the weed? Jesus.  That's what your're lacing it with?" |
| Defendant: | *Inaudibly speaking.* |

(Id. at 05:00-08:00.)

After this exchange, Deputy Dailey entered the home without knocking and approached Ms. Keller in the hallway that connects the living room to the bedrooms.  (Dailey Body Camera 1, 06:30-06:45.)  He asked Ms. Keller "how long has [Defendant] been staying here," to which she responded he moved out a long time ago but stays the night every once in a while.  (Id. at 06:45-07:07.)  Deputy Dailey told her Defendant's story about a gun hidden in the woods, and Ms. Keller responded she has "never seen [Defendant] with a gun."  (Id. at

07:15-07:25.)  Deputy Dailey explained to Ms. Keller "I want to make sure there is not a gun in the house" because of his concern for the safety of her children and asked where in the home Defendant slept the night before.  (Id. at 07:25-07:40.)  At this time, the video shows one of Ms. Keller's three children standing in the kitchen.  (Id.; see also Suppression Hr'g Tr., pp. 36-37.)

Moving from the hallway to the living room, Ms. Keller explained Defendant slept the night before on the couch, and she showed Deputy Dailey the couch.  (Dailey Body Camera 1, 07:30-07:55.)  Deputy Dailey began feeling the cushions and found a handgun in less than ten seconds.  (Id. at 07:50-08:00.)  Ms. Keller confirmed Defendant slept on the couch where the gun was located and said she did not know anything about the gun.  (Id. at 08:05-08:15.)  With the gun in hand, Deputy Dailey left the home.  (Id. at 08:30-09:00.)

Deputy Durand testified he asked Defendant for the gun location out of concern for the safety of Ms. Keller and the officers, and Deputy Dailey testified he searched the home for Defendant's gun because he did not believe Defendant's statement the gun was in the woods, and he did not want to leave the gun behind out of concern for Ms. Keller's children. (Suppression Hr'g Tr., pp. 14, 24, 28; see also Dailey Body Camera 1, 07:00-07:20.)  Ms. Keller never gave express permission for Deputy Dailey to search the couch for the gun, but Deputy Dailey testified he believed she impliedly consented to the search.  (Suppression Hr'g Tr., pp. 28, 34-36.)  Ms. Keller never told Deputy Dailey to leave the home or forbade him from searching for the gun, but she did explain when the officers first arrived that she was in a hurry for everyone to leave because she needed to attend a family funeral.  (Id. at 34-35.)

At the police car, Defendant explained to Deputy Durand he was on probation because of drugs.  (Durand Body Camera, at 08:00-09:10.)  Deputy Durand asked Defendant again who owned the gun, and Defendant refused to say.  (Id. at 09:30-09:45.)   Deputy Dailey arrived at the car with the gun, and Deputy Durand confirmed the active warrants for Defendant's arrest.  (Id. at 09:45-30:53.)   While Defendant was sitting in the back of the police car, Deputy Dailey asked Defendant if he had any other drugs on his person and Defendant said no.  (Dailey Body Camera 2, doc. no. 25-1, video 3 of disc 1, 06:45-07:15.) Deputy Dailey testified he did not search Defendant before placing him in the police car because Defendant had already taken the cocaine and magazine out of his pants. (Suppression Hr'g Tr., p. 27.)  At no point did the deputies read Defendant his Miranda rights.  (Id. at 18, 24.)  On September 12, 2019, the grand jury in the Southern District of Georgia charged Defendant with one count of possessing cocaine and one count of possessing a firearm and ammunition as a prohibited person.  (Doc. no. 1.)

## II.   DISCUSSION

Defendant argues the absence of Miranda warnings and express consent to search for the gun requires suppression of the cocaine, magazine, and gun, as well as all related statements.   Conceding Defendant was in custody, the government argues (1) Defendant admitted to cocaine possession and surrendered possession of the cocaine and magazine voluntarily and without any prompting; (2) the cocaine and magazine would have been discovered inevitably during his arrest; (3) the questions posed to Defendant regarding the gun and cocaine fall within the public safety exception to Miranda; and (4) Ms. Keller impliedly consented to the search.  For the reasons set forth below, the Court recommends

(1) suppression of all incriminating statements except Defendant's admission of cocaine use and possession, and statements concerning type, description, and location of the missing gun; and (2) no suppression of the cocaine, magazine, and gun.

**A.    The Court Should Suppress All of Defendant's Incriminating Statements Except the Admission of Cocaine Use and Possession, and Statements Concerning Type, Description, and Location of the Gun**

"No person . . . shall be compelled in any criminal case to be a witness against himself . . . ." U.S. Const. Amend. V.  "To give force to the Constitution's protection against compelled self-incrimination, the Court established in <u>Miranda</u>, 'certain procedural safeguards that require police to advise criminal suspects of their rights under the Fifth and Fourteenth Amendments before commencing custodial interrogation.'" <u>Florida v. Powell</u>, 559 U.S. 50, 59 (2010) (quoting <u>Duckworth v. Eagan</u>, 492 U.S. 195, 201 (1989)).  Under <u>Miranda</u>, prior to conducting a custodial interrogation, law enforcement officers must warn the interview subject that he has a "right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." <u>Miranda v. Arizona</u>, 384 U.S. 436, 444 (1966).  The Supreme Court has defined custodial interrogation as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." <u>Id.</u>

Not all statements made in custody are considered the product of interrogation and require <u>Miranda</u> warnings, but, instead, the interrogation "must reflect a measure of compulsion above and beyond that inherent in custody itself." <u>Rhode Island v. Innis</u>, 446 U.S. 291, 299-300 (1980) (citing <u>Miranda</u>, 384 U.S. at 478).  Thus, <u>Miranda</u> warnings are

only necessary when the person in custody is subjected to "express questioning or its functional equivalent" that the officers "should have known were reasonably likely to elicit an incriminating response," defined as any response a prosecutor may seek to introduce at trial. Id. at 300-01, n.5. The subjective belief or intent of officers is not determinative of whether an interrogation occurred. Id. at 301. As the Eleventh Circuit recently explained, "statements made in violation of Miranda must generally be suppressed. United States v. Robinson, 760 F. App'x 762, 764 (11th Cir. 2019).

When Defendant finished the phone conversation with his brother, Deputy Dailey suggested they walk to his patrol car to determine whether Defendant had outstanding arrest warrants. (Durand Body Camera, 04:45-04:55.) Defendant responded, "I use cocaine, I do have cocaine, and I have multiple cocaine charges." (Id. at 04:52-05:00.) Defendant made these statements unexpectedly, voluntarily, and without the deputies asking any questions they should have known would elicit an incriminating response. (Id. at 04:30-05:00.) There is no basis to suppress these statements because "[v]oluntary incriminating statements that are not made in response to custodial interrogation [] are admissible." United States v. Alvarez, No. 4:10-CR-32-01-HLM, 2011 WL 744648, *6 (N.D. Ga. Feb. 10, 2011) (citing Innis, 446 U.S. at 299–300).

After Defendant's admission of cocaine possession, however, the deputies began peppering him with questions they should have known would elicit incriminating responses, such as whether he was currently in possession of cocaine, whether the gun was stolen, why he hid the gun in the woods, who gave him the gun, whether he had any crack in addition to cocaine, and how he used cocaine and crack. The government contends such questions do

not violate <u>Miranda</u> because they relate to, and merely follow-up on, Defendant's voluntary admission of cocaine possession and use.  This exception to <u>Miranda</u>, however, is strictly limited and not applicable to any of the officers' questions.

When a criminal suspect makes a voluntary statement that is ambiguous, police officers may ask clarifying questions without running afoul of <u>Miranda</u> so long as the questions do not appear to be intended to elicit an incriminating response.  <u>United States v. Villegas–Tello</u>, 319 F. App'x 871, 875-76 (11th Cir. 2009).  This exception to <u>Miranda</u> does not apply here, however, because there is no ambiguity in the statement "I use cocaine, I do have cocaine, and I have multiple cocaine charges."  The follow-up questions concerning whether Defendant possessed the cocaine on his person and where the cocaine was located, for example, were not "neutral response[s], intended to clarify [Defendant's] puzzling declaration . . . ."  <u>Andersen v. Thieret</u>, 903 F.2d 526, 532 (7th Cir.1990).  In stark contrast, the defendant in <u>Villegas-Tello</u> cryptically told the police officer "the green's not mine," and the policy officer merely followed up on this puzzling declaration by asking to clarify whether the reference to the color green referred to marijuana.  319 F. App'x at 874.

Falling within the public safety exception to <u>Miranda</u>, however, are the officers' questions concerning location, type, and description of the gun, i.e. "Where's the gun at?", "Are you gonna show us where the gun is?", "What kind of gun was it?", and "You don't know if it's a nine, a forty, or a forty-five, three-eight?"   These questions, and Defendant's responses, fall comfortably within the exception to <u>Miranda</u>, first recognized in <u>New York v. Quarles</u>, 467 U.S. 649, 657 (1984), for "questions reasonably prompted by a concern for the public safety."  467 U.S. at 657.

10

In <u>Quarles</u>, officers apprehended a rape suspect who was running toward the rear of a supermarket, and because he was wearing an empty holster, the officers asked the suspect for the missing gun's location before Mirandizing him.  The Supreme Court held the suspect's answer to this question was admissible because <u>Miranda</u> should not be applied "in all its rigor to a situation in which police officers ask questions reasonably prompted by a concern for the public safety."  <u>Id.</u> at 656.  The Court explained "[s]o long as the gun was concealed somewhere in the supermarket, with its actual whereabouts unknown, it obviously posed more than one danger to the public safety:  an accomplice might make use of it, a customer or employee might later come upon it."  <u>Id.</u> at 657.  The same reasoning applies here, perhaps more forcefully, because the deputies knew Ms. Keller's three children lived with her in the home, and the gun obviously posed a danger if Ms. Keller or her children "might later come upon it."  <u>Id.</u>

Further supporting the Court's conclusion is <u>United States v. Williams</u>, 784 F. App'x 707, 707 (11th Cir. 2019), wherein the Eleventh Circuit held an officer's questions concerning the location of a firearm inside a home fell within the public safety exception.  As here, the officers in <u>Williams</u> responded to a call at Ms. Keller's home because of a domestic dispute.  <u>Id.</u> at 709-10.  Questions about the location of the arrested suspect's firearm fell within the public safety exception because the complaining party was agitated and "there were multiple people at the house, including young children, some of whom were upset that Williams was being arrested."  <u>Id.</u> at 710.[1]

---

[1] <u>See also</u> <u>United States v. Ochoa</u>, 941 F.3d 1074, 1096-98 (11th Cir. 2019) (applying public safety exception when officers asked armed robbery suspect questions concerning

While "availability of [the] exception does not depend upon the motivation of the individual officers involved," <u>Quarles</u>, 467 U.S. at 656, Deputies Durand and Dailey both testified they asked Defendant questions about the gun location and searched for the gun out of concern for the safety of themselves and Ms. Keller's three children.  (Suppression Hr'g Tr., pp. 14, 24, 28; <u>see also</u> Dailey Body Camera 1, 07:25-07:40.)  Deputy Dailey even asked Defendant why he would leave a gun in the woods for children like Ms. Keller's to find. (Durand Body Camera, 05:00-06:30.)

The government argues the public safety exception also applies to questions concerning Defendant's possession of cocaine and its location.  The argument raises the interesting issue whether questions concerning the location of controlled substances fall within the public safety exception when officers know children live in a home where an admitted drug dealer spent the previous night and is admitting to being currently in possession of controlled substances.  <u>See, e.g.</u>, <u>United States v. Henry</u>, 939 F. Supp. 2d 1279, 1296 (N.D. Ga. 2013) (analyzing cases concerning location of controlled substances and public safety exception).  The Court need not address this issue, however, because of the specific questions and answers at issue here.

The exchange at issue occurred immediately after Defendant admitted to using cocaine and being in possession of cocaine, as follows:

---

existence of any dangerous items inside residence defendant just exited); and <u>United States v. Newsome</u>, 475 F.3d 1221, 1224-25 (11th Cir. 2007) (applying public safety exception where officer preparing to enter motel room asked defendant about items in room police "need to know about" in consideration of defendant's violent history, suspicion defendant had gun, and belief another person was still inside room).

| Durand and Dailey: | "Do you have cocaine on you?" |
|---|---|
| Defendant: | "Yes, ya'll can throw it away please. Don't let me get another felony.  I got fifteen years' probation. That what I got the warrant for.  They took me to a homeless shelter." |
| Deputy Durand: | "Why are you doing cocaine, man? Where's it at?" |
| Defendant: | "I just smoked [*mumbling*] weed. I don't have no pound of weed."  *Begins handing over cocaine and magazine in his pockets.* "I got a clip on me. My lawyer will be able to tell you [*mumbling*] I sell weed.  I don't want no charges.  I'm just trying to be honest with you guys. I got fifteen years' probation. Like, I come from a background of parent . . ." |

(Durand Body Camera, 05:00-06:00.)

The first question, asking whether Defendant had cocaine on his person, falls outside the public safety exception because there is no danger posed to arresting officers or the public by a suspect's possession of controlled substances on his person.  Nor, quite obviously, is there any basis for applying the public safety exception to the second question concerning why Defendant uses cocaine.  The public safety exception does not apply to the third question either because it is clear from the context Deputy Durand was asking where on Defendant's person the cocaine was located, not whether it was located some other place that might endanger Ms. Keller, her children, or the public at large.  Indeed, Defendant had just admitted the cocaine was on his person.

Finally, after the exchange quoted in full in § I, supra, there are a multitude of additional questions and answers exchanged between Defendant and the officers after they left the back yard and approached the police car.  Defendant seeks suppression of all such statements without identifying any in particular.  The Court will not undertake a detailed

13

analysis of the entire exchange, but instead finds suppression is warranted for any statement—"whether inculpatory or exculpatory—that the *prosecution* may seek to introduce at trial." Innis, 446 U.S. at 301-02 n.5 (1980).

**B.    The Inevitable Discovery Doctrine Saves the Cocaine, Magazine, and Gun**

The cocaine and magazine should not be suppressed because the officers would have inevitably discovered them even if they had not asked the questions that prompted Defendant to remove the cocaine and magazine from his pockets.  The inevitable discovery doctrine allows the government to introduce evidence obtained from an illegal search or other violation if there is a "'reasonable probability' that the evidence in question would have been discovered by lawful means."  United States v. Johnson, 777 F.3d 1270, 1274 (11th Cir. 2015) (quoting Jefferson v. Fountain, 382 F.3d 1286, 1296 (11th Cir. 2004)).  The government must show "the lawful means which made discovery inevitable were being actively pursued prior to the occurrence of the illegal conduct."  Johnson, 777 F.3d at 1274 (quoting Jefferson, 382 F.3d at 1296).  The inevitable discovery doctrine is an exception to the fruit of the poisonous tree doctrine that breaks the causal chain and defeats a motion to suppress.  United States v. Timmann, 741 F.3d 1170, 1182-83 (11th Cir. 2013)

Deputy Durand testified Defendant was being detained on the outstanding warrants even without Defendant's admission of cocaine possession, and he and Deputy Dailey further testified they did not search Defendant before placing him in the police car only because Defendant had already taken the cocaine and magazine out of his pants. (Suppression Hr'g Tr., pp. 14-15, 27.)  Based on this testimony, the Court finds it reasonably probable the deputies would have discovered the cocaine and magazine during a search

incident to Defendant's arrest if Defendant had not removed these items from his pockets. Evidence obtained during a search incident to an arrest is constitutional and admissible. United States v. Fuentes, 368 F. App'x 95, 98 (11th Cir. 2010).

The Court further finds it reasonably probable that discovery of the magazine during a search incident to Defendant's arrest would have led the officers to ask Defendant the same questions concerning the gun's location and to conduct the same search for the gun out of concern for the safety of Ms. Keller and her three children.  That the officers did not know about the gun's existence, and thus had not already planned to search for it before the Miranda violations occurred, is unimportant.  "Active pursuit does not require that police have already planned the particular search that would obtain the evidence.  The government must instead establish that the police would have discovered the evidence 'by virtue of ordinary investigations of evidence or leads already in their possession.'"  Johnson, 777 F.3d at 1274 (quoting United States v. Virden, 488 F.3d 1317, 1323 (11th Cir. 2007).

### C. Suppression of the Gun is Unwarranted Because Ms. Keller Impliedly Consented to the Search

The Court also rejects Defendant's argument that Deputy Dailey conducted his search for the gun inside the home without Ms. Keller's consent.  While it is undisputed Ms. Keller never gave express consent for the gun search, she impliedly consented to the search through her words and conduct.

Defendant has a reasonable expectation of privacy as an overnight guest in Ms. Keller's home.  See, e.g., United States v. Maxi, 886 F.3d 1318, 1326 (11th Cir. 2018) (citing Minnesota v. Olson, 495 U.S. 91, 98–100, (1990)) ("An overnight guest has a reasonable

expectation of privacy in a residence sufficient to establish standing.").   Under the Fourth Amendment, a search conducted pursuant to valid consent is constitutionally permissible. Schneckloth v. Bustamonte, 412 U.S. 218, 222 (1973).   The government bears the burden of proving consent that is freely and voluntarily given.   Id.   Consent to a search is voluntary if it is the product of an essentially free and unconstrained choice.   United States v. Boulette, 265 F. App'x 895, 898 (11th Cir. 2008).   "The standard for measuring the scope of . . . consent . . . is that of 'objective' reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the [individual giving the consent]?" Florida v. Jimeno, 500 U.S. 248, 251 (1991).   The Eleventh Circuit has previously found "a search consensual where no verbal consent was given, but the defendant's body language indicated his assent to the search." United States v. Chrispin, 181 F. App'x 935, 939 (11th Cir. 2006) (citing United States v. Ramirez–Chilel, 289 F.3d 744, 752 (11th Cir. 2002).

Having carefully considered every aspect of the interaction between Ms. Keller and Deputy Dailey immediately preceding Deputy Dailey's search of the living room couch, the Court finds Ms. Keller impliedly consented to the search.   (See Dailey Body Camera 1, 06:30-09:00.)   When Deputy Dailey reentered the home and told Ms. Keller about the existence of a missing gun, he explained he did not want any of her children to come across it accidentally.   (Id.)   Ms. Keller responded she had not seen a gun, "totally agreed" with Deputy Dailey, and did not believe in guns.   (Id.)   Deputy Dailey expressly stated, "I want to make sure there is not a gun in the house," and asked Ms. Keller where Defendant had slept the night before and if he had any of his stuff in a certain area.   (Id. at 07:25-09:00.)   Ms. Keller directed Deputy Dailey to the couch, saying he slept there.   (Id.)   They both walked

over to the couch, and Ms. Keller confirmed Defendant slept there.  (Id.)  Deputy Dailey searched the couch cushion with Ms. Keller standing next to him.  (Id.)

The inescapable conclusion from this series of events is that Ms. Keller shared Deputy Dailey's concern for the safety of her children and danger of a missing gun, did not like guns, agreed the gun needed to be located, consented to Deputy Dailey searching her home for the gun, and actively assisted him in the search.   Ms. Keller's ambivalent testimony, which suggests she may have had unvoiced reservations concerning the search, is not credible and is inconsistent with the body camera footage as described above.   The Eleventh Circuit has found implied consent in similar circumstances.  See, e.g., Ramirez-Chilel, 289 F.3d at 752, (finding implied consent for officers' initial entry into home where defendant, standing in front door when asked by officers if they could enter, did not answer verbally but physically yielded right of way to officers); Chrispin, 181 F. App'x at 939 (finding implied consent where defendant said nothing when officer asked to frisk him but indicated consent through body language by turning away from officer and placing his hands on police cruiser as if preparing to be searched).

Lastly, Defendant has not argued, and the Court can find no basis for concluding, Ms. Keller's consent was coerced or obtained through intimidation rather than being freely and voluntarily given.   There are no accusations of any tactics of coercion or intimidation, and none is apparent from the body camera footage and testimony.   Indeed, the deputies remained casual, exhibited no signs of aggression or intimidation, and politely explained their concern about the gun and desire to find it for the sake of the children.   Because Ms.

Keller freely and voluntarily consented to the search, there is no basis for suppression of the gun.

III.    **CONCLUSION**

The Court **REPORTS** and **RECOMMENDS** Defendant's original motion to suppress be **DENIED AS MOOT**, (doc. no. 20), and Defendant's supplemental motion to suppress be **GRANTED IN PART** and **DENIED IN PART**, (doc. no. 29).  The Court should not suppress Defendant's admission of cocaine use and possession or the questions and answers concerning type, description, and location of the missing gun.  The Court recommends suppression of all other statements, whether inculpatory or exculpatory, the prosecution may seek to introduce at trial.  The cocaine, magazine, and gun should not be suppressed.

SO REPORTED and RECOMMENDED this 23rd day of January, 2020, at Augusta, Georgia.

BRIAN K. EPPS
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA

18